IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR 07-1439-TUC-FRZ(HCE) |
| | ) | |
| Plaintiff, | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| vs. | ) | |
| | ) | |
| | ) | |
| ARTURO SANTOS-GRANADOS, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

Defendant Arturo Santos-Granados (hereinafter "Defendant") filed a Motion to Suppress Evidence (Doc. No. 13) of a Glock 9 mm pistol allegedly possessed by him on July 11, 2007 at or near Tucson, Arizona.  Defendant's Motion To Suppress came on for hearing on December 27, 2007.

For the reasons stated herein, the Magistrate Judge recommends that the District Court grant Defendant's Motion to Suppress Evidence of a Glock 9 mm pistol alleged in Count 1 of the Superceding Indictment.

I. PROCEDURAL AND FACTUAL HISTORY.

A.  Charge

Defendant was charged by Indictment on August 8, 2007 with being an Illegal Alien In Possession of a Firearm in that on or about July 11, 2007 at or near Tucson, Arizona he knowingly possessed a Glock 9 mm, Model 17, bearing serial number HRK 332, which contained a magazine containing ten rounds of ammunition, said firearm being in and

affecting commerce in that it was previously shipped and transported into the State of Arizona from another state or foreign country, in violation of 18 U.S.C. §§922(g)(5)(A) and 924(a)(2).  (Doc. No. 6).

Defendant was charged by Superceding Indictment on December 12, 2007 with being an Illegal Alien In Possession of a Firearm in violation of 18 U.S.C. §§ 922(g)(5)(A) and 924(a)(2), as previously charged (Count 1).  In addition, Defendant was charged with Illegal Re-entry After Deportation in that on or about July 11, 2007 at or near Tucson, Arizona Defendant was an alien previously denied admission, excluded, deported, and removed from the United States on January 10, 2000 and did not obtain the express consent of the Attorney General or the Secretary of the Department of Homeland Security to reapply for admission in violation of 8 U.S.C. §1326 (Count 2).  (Doc. No. 22).

B. Testimony

On December 27, 2007 U.S. Border Patrol Agent Christopher Lee Leblanc (hereinafter "BPA Leblanc") testified.  BPA Leblanc is employed by Border Patrol and has received instruction at the Border Patrol Academy in, *inter alia*, vehicle stops.  (BPA Leblanc testimony, Transcript p. 5 (hereinafter "Leblanc  p. __")).  After attending the Border Patrol Academy, BPA  Leblanc was paired with a journeyman agent and obtained practical experience. (Leblanc pp. 5-6).  By this experience he learned about vehicles commonly used to smuggle large groups of people: vehicles that can have the backseats removed and/or have a large trunk space. (Leblanc p.6).

BPA Leblanc has participated in over 100 arrests regarding alien smuggling and over 50 arrests regarding narcotics smugglers.  (Leblanc p. 7).

1       On July 11, 2007 at the inception of rush hour[1], at approximately 5:45 p.m., BPA Leblanc

2  was assigned as a field training officer for three other trainee agents.  (Leblanc pp. 9, 27).

3  He was in the front passenger seat of a marked Border Patrol vehicle driven by one of the

4  three trainee agents.  (Leblanc pp. 10, 14, 26).  On this date and time BPA Leblanc and the

5  trainee agents were southbound on the Nogales Highway 50 miles north of the United States

6  - Mexico border. (Leblanc pp 10-11).  The Nogales Highway runs north and south, to and

7  from Nogales, Arizona and Tucson, Arizona. (Id.) The Nogales Highway runs parallel to

8  Interstate 19 which also runs north and south, to and from Nogales, Arizona and Tucson,

9  Arizona. (Id.)

10     BPA Leblanc's attention was drawn to an oncoming northbound Pontiac Grand Am

11  (hereinafter "Pontiac") red in color on the Nogales Highway because "[t]his is the type of

12  vehicle that's commonly used to smuggle aliens in and/or contraband," i.e. the backseat can

13  be removed to accommodate a large number of people with easy access to the back trunk

14  which is a large space.  (Leblanc pp. 11-12).  BPA Leblanc was trained on the importance

15  of preparing reports.  (Leblanc p. 23).  However, BPA Leblanc did not include in his report

16  any information regarding the observed vehicle; could not testify as to the dimensions of the

17  trunk space; and as to the year of the vehicle he "...want[ed] to say mid - 90's.  I don't

18  remember off the top of my head.  I don't have the records check in front of me."  (Leblanc

19  pp. 28-31).  Nothing was offered by BPA Leblanc in testimony or notation in his report that

20  the Pontiac was riding low consistent with a "large number of people" or contraband in the

[1] Despite BPA Leblanc's characterization of traffic conditions as "rush hour", in his opinion there were not a lot of vehicles at that time.  (Leblanc p. 27). BPA Leblanc also testified that "...the driver which keyed me initially was the - - the driver.  He sat up in the vehicle, sat up, sat rigid, grabbed a [sic] hold of the steering wheel, sat rigidly in the vehicle, stared straight forward, was not relaxed at all as he - - *you're coming up to no traffic people tend to be a little bit relaxed and a little casual as they drive...*"  (Leblanc p. 13) (emphasis added).  Nonetheless, his reason for being suspicious about the Pontiac Grand Am in which Defendant was a passenger is because at "...this time of day, alien smugglers attempt to blend in with rush hour traffic."  (Leblanc p. 27).

1   trunk; or alternatively, that the Pontiac was equipped with modified suspension to

2   accommodate a heavy load.

3       BPA Leblanc on Defendant's Exhibit 2, a diagram of Nogales Highway denoting in pink

4   his vehicle southbound and denoting in green the Pontiac northbound when he first observed

5   it, testified that he could see clearly into the vehicle and discerned the driver and front seat

6   passenger were both males, were conversing, and the driver was driving in what he

7   considered to be a relaxed posture. (Leblanc, pp. 12-13, 25). This observation was made

8   from a distance of 150 yards. (Leblanc p. 26).

9       When BPA Leblanc's southbound vehicle passed the northbound Pontiac he noted that the

10  driver would not make eye contact with him and instead stared straight ahead. (Leblanc pp.

11  13, 14). In his opinion they were acting nervous, i.e., sat straight, one gripping the steering

12  wheel, and staring straight forward. (Leblanc pp. 13 -14). He instructed the driver of his

13  marked Border Patrol vehicle to turn around and follow the Pontiac (Leblanc p. 14). Once

14  the Border Patrol vehicle was positioned behind the Pontiac, BPA Leblanc noted that over

15  the span of five minutes the front seat passenger, later determined to be Defendant, looked

16  over his shoulder "[p]robably two or three times." (Leblanc p. 16). In his experience this

17  is an enormous number of looks to take. [2]  (Leblanc p. 34).

18      BPA Leblanc testified that the Pontiac was traveling north at approximately 40 miles per

19  hour. (Leblanc p. 14). The driver of the Border Patrol vehicle followed the Pontiac for five

20  minutes from "[p]robably one car length, two car lengths at the most."[3] (Leblanc p. 15).

21  During this time the driver of the Pontiac would look at his side view mirror and adjust the

22  rearview mirror constantly. (Leblanc p. 15). BPA Leblanc testified that both the driver, and

23

24      [2] BPA Leblanc did not note in his report that at any time he saw in the Pontiac back

25  seat a crying and restless child in a car seat later determined to be Defendant's son. (Leblanc
    pp. 31-33).

26

27      [3] Pursuant to Fed.R.Evid. 201, the Court takes judicial notice that a vehicle traveling

28  40 miles per hour will travel 3.33 miles in 5 minutes and of the mathematical equation to
    determine same (*e.g.* 40 miles $\div$ 60 minutes =.66 x 5 minutes = 3.33).

1    Defendant when looking over his shoulder, were looking to see what he was doing thus

2    making him suspicious.  (Leblanc pp. 15, 34):

3            Q.  Thank you.  Then, as you turn around and you follow
             Granados as a passenger, and he turns around, that makes you
4            suspicious?
             A.  Yes
5            Q.  So you can't win.  If a person doesn't look at you and looks
             rigidly ahead, he's suspicious, right?
6            A.  Is [sic] this line of work, yes.  You can't be - -
             Q.  And if a person turns around and looks at you twice over a
7            five minute period, that makes you suspicious, right?
             A.  As - - it starts raising my level of suspicion, yes.

8

9    (Leblanc, p. 34).

10        During the five minutes that the Pontiac was being followed a records check on the

11   license plate, which was a Nevada license plate, was run.  (Leblanc p. 16).  BPA Leblanc has

12   conducted a number of stops of Nevada-licensed vehicles resulting in illegal aliens being

13   discovered therein.  (Leblanc p. 16).  Also performed was a "1072 or a lane check which...

14   [indicates] when that vehicle last crossed through the port of entry." (Id.)  It was determined

15   that the Pontiac had neither recently been in Mexico nor recently made an entry into the

16   United States.  (Id.)  BPA Leblanc testified that this was significant because vehicles that go

17   to Tucson, Nogales, Amado or Arivaca generally make a trip into Mexico.  (Leblanc p. 17).

18   Consequently, vehicles not going to Mexico "...potentially pick up illegal aliens."  (Id.)

19   However, "[t]hat's not one of the justifiable facts" but rather "potentially unusual." (Leblanc

20   pp. 37 -38).

21        BPA Leblanc testified that in his opinion other communities in the area, e.g. Tubac,

22   Tumacacori, Carmen, Rio Rico, and Nogales, Arizona are little in number for utilization of

23   the Nogales, Highway (Leblanc pp. 38-39).  However, vehicles do utilize the Nogales

24   Highway to avoid Interstate 19 traffic.  (Leblanc p. 28).  Moreover, the Interstate 19 Border

25   Patrol checkpoint can be circumvented by use of the Nogales Highway. (Leblanc p. 39).

26        After following the Pontiac for five minutes the Border Patrol vehicle driver activated

27   emergency equipment and the Pontiac immediately yielded without incident.  (Leblanc p.

28   18).  The driver and Defendant were questioned.  Defendant was evasive regarding his

1   identity and immigration status.  (Leblanc pp. 18-19).  After providing his true name and

2   immigration status, Defendant was asked to step out of the vehicle and a search of his person

3   was conducted.  (Leblanc p. 19).  A handgun was found in the small of his back in the

4   waistband.  (Leblanc p. 20).

5         BPA Leblanc was recently, or in the last seven years, disciplined for dishonesty as a

6   Border Patrol Agent, specifically misuse of a government credit card.  (Leblanc pp. 35-36).

7   II. LAW AND DISCUSSION

8         A. Standing

9         On July 11, 2007 Defendant was a passenger in a Pontiac driven by another.  Such

10  vehicle was stopped upon BPA Leblanc's instruction based in whole or in part on

11  observations of the driver and/or Defendant.  Once the Pontiac stopped, both the driver and

12  Defendant were questioned while seated in the vehicle.  Defendant was told to step out of the

13  vehicle at which time he was searched.

14        It has long been settled under the Fourth Amendment that when an officer conducts

15  a traffic stop, the driver and its occupants are seized.  *Delaware v. Prouse*, 440 U.S. 648, 653

16  (1979) ("[s]topping an automobile and detaining its occupants constitute a 'seizure' within

17  the meaning of [the Fourth and Fourteenth] Amendments....");  *Colorado v. Bannister*, 449

18  U.S. 1, 4 n.3 (1980) (*per curiam*) ("There can be no question that the stopping of a vehicle

19  and the detention of its occupants constitute a 'seizure' within the meaning of the Fourth

20  Amendment.");  *Berkemer v. McCarty*, 468 U.S. 420, 436-437 (1984) ("[W]e have long

21  acknowledged that stopping an automobile and detaining its occupants constitute a

22  'seizure.'");  *United States v. Hensley*, 469 U.S. 221, 226 (1985) ("[s]topping a car and

23  detaining its occupants constitute a seizure");  *Whren v. United States*, 517 U.S. 806, 809 -810

24  (1996) ("Temporary detention of individuals during the stop of an automobile by the police,

25  even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons'

26  within the meaning of [the Fourth Amendment]");  *United States v. Colin,* 314 F.3d 439, 442-

27  443 (9th Cir. 2002) ("We have held that occupants of a vehicle have standing to challenge on

28  Fourth Amendment grounds an officer's stop of their vehicle even if they have no possessory

1  or ownership interest in the vehicle."); *United States v. Twilley*, 222 F.3d 1092, 1095 (9th Cir.

2  2000) (same).

3      When the traffic stop of the Pontiac occurred, Defendant as a passenger was seized

4  for Fourth Amendment purposes and may challenge the stop's constitutionality. *Brendlin*

5  *v. California*, __ U.S. __, 127 S.Ct. 2400 (June 18, 2007).

6      B. Investigatory Stop

7      The Fourth Amendment's protection against unreasonable searches and seizures

8  extends to brief investigatory stops of persons or vehicles shy of a traditional arrest. *Terry*

9  *v. Ohio*, 392 U.S. 1, 9 (1968). The Fourth Amendment's strictures are satisfied if an officer's

10  action is supported by reasonable suspicion to believe criminal activity is or may be afoot.

11  *United States v. Cortez*, 449 U.S. 411, 417 (1981). The court must look at the "totality of the

12  circumstances" of each case to determine whether the detaining officer has a "particularized

13  and objective basis" for suspecting legal wrongdoing. *United States v. Arvizu*, 534 U.S. 266,

14  273 (2002) (citing *Cortez*, supra at 417-418).

15      An officer may evaluate facts supporting reasonable suspicion based on his experience

16  and training. *United States v. Montero-Camargo*, 208 F.3d 1122, 1131 (9th Cir. 2000); *see*

17  *also Arvizu,* 534 U.S. at 273. Experience alone may not be used to give an officer unbridled

18  discretion in making a stop. *Nicasio v. INS*, 797 F.2d 700, 705 (9th Cir. 1986), *overruled in*

19  *part on other grounds in Hodgers-Durgin v. De La Vina,* 797 F.2d 700, 705 (9th Cir. 1986).

20  "Reasonable suspicion" is based on specific articulable facts, together with rational

21  inferences from those facts, that gives rise to individualized suspicion of the particular person

22  to be stopped. *United States v. Brignoni-Ponce*, 422 U.S. 873, 884 (1975); *United States v.*

23  *Rodriguez*, 976 F.2d 592, 594 (9th Cir. 1992), *amended* 997 F.2d 1306 (9th Cir. 1993),

24  (Reasonable suspicion requires that the specific facts and inferences create suspicion "that

25  the particular person detained is engaged in criminal activity."). However, the inferences that

26  officers draw based upon their training and experience "must also be grounded in objective

27  facts and be capable of rational explanation." *United States v. Rojas-Millan,* 234 F.3d 464,

28  469 (9th Cir. 2000). Reasonable suspicion cannot rely solely on generalizations that, if

1   accepted, casts suspicion on large segments or entire categories of the law abiding

2   population.  *United States v. Sigmond-Ballesteros*, 285 F.3d 1117, 1121 (9th Cir. 2002).

3                    1.  Witness Credibility

4          The Court with ample opportunity observed and heard testimony given by the only

5   witness called by the Government: BPA Leblanc.  It is this Court's finding that testimony

6   given by BPA Leblanc, as will be discussed below, was implausible and an unbelievable

7   accounting of critical facts.  *See United States v. Hernandez-Acuna*, 498 F.3d 942, 944 (9th

8   Cir. 2007).   The investigatory stop conducted by BPA Leblanc was based upon mere

9   subjective impressions.  *Untied States v. Hernandez-Alvarado*, 891 F.2d 1414, 1416 (9th Cir.

10  1989).   Inferences drawn therefrom were not reasonable.  *Cortez*, 449 U.S. at 418.

11  Consequently, BPA Leblanc's testimony was not credible.

12                   2.      Factors Giving Rise to the Stop

13                        a. Type of Vehicle

14         It stretches credulity to believe that BPA Leblanc was able to discern from 150 yards

15  two conversing males, a driver and the front-seat passenger Defendant, in an approaching

16  vehicle.  What allegedly drew BPA Leblanc's attention to the on-coming vehicle was that

17  it was a Pontiac Grand Am: a vehicle commonly used to smuggle aliens in and/or contraband

18  because of access to the back trunk which is a large space.  This Court finds that the more

19  plausible and probable explanation for BPA Leblanc's attention being drawn to the vehicle

20  from that distance was merely that it was the color red.  This is particularly so given: 1) no

21  mention of the make and model was indicated in his report; [4] 2) even based on his training

22  _____

23         [4] Q. *Did you read the Government's Response to the Motion to Suppress* filed by the
    Defendant in this case?

24         A.  Yes

25         Q.   And you are aware that in that Motion - - that that Response, the following is
    said. It says, the agent's attention was initially drawn to the vehicle because he knows that
26  particular make and model of car is popular with narcotics and alien smugglers because of
    the large trunk capacity.  Do you remember that statement - -
27         A.  Correct.

28         Q.   - - in the Response?

                              - 8 -

1   he could not offer any dimension of the trunk space of this make and model Pontiac

2   accommodating to illegal aliens and/or contraband; 3) he could only venture a guess as to the

3   year of the vehicle and would only be able to give such information by reference to a

4   "records check" in front of him.  (Leblanc pp. 30-31).  Thus, any particularized attention to

5   the vehicle make and model as used in legal wrongdoing, was non-existent at the initial

6   observation. *See* Factor "c", infra, pp. 10-11.

7                              b.  Rush Hour Traffic

8            BPA Leblanc testified that he wrote in his report that the time he observed the Pontiac

9   was at 5:45 p.m. when alien smugglers attempt to blend in with rush hour traffic presumably

10  raising his suspicion.  This factor's importance dissipates entirely in light of BPA Leblanc's

11  concession that 1) the Nogales Highway is used as an alternate route to avoid having to travel

12  with rush hour traffic on Interstate 19 (Leblanc p. 28).; 2) there were not a lot of vehicles on

13  the Nogales Highway (Leblanc p. 27); 3) there are any one of a number of communities in

14  the area that would make use of the Nogales Highway.  (Leblanc pp 17, 38-39).

15           More importantly, BPA Leblanc offered no testimony that may have otherwise given

16  rise to reasonable inferences based on facts and his experience, such as: 1) the Nogales

17  Highway is a notorious or well-known route used by smugglers; 2) recent activity of

18  smuggling on the Nogales Highway; 3) a check point on Interstate 19 was in operation at that

19  time such that a smuggler would circumvent it by using the Nogales Highway.

20           Testimony by BPA Leblanc relying on this factor in the panoply of considerations is

21  solely a generalization casting suspicion on large segments of the law abiding population.

22  *Sigmond-Ballesteros*, 285 F.3d at 1121;  *Montero-Camargo*, 208 F.3d 1122 at 1129-33;

23  *Rodriguez*, 976 F.2d at 595-596, *amended* 997 F.2d 1306.

24  _____

25           A.  Yes
             Q.  All right.  Now, this is precisely your testimony this morning, right?
26           A.  Uh-huh.
             Q.  *And that's precisely the observation that you didn't include in your report.*
27           A.  *I didn't think it was relevant.*  (Leblanc p. 34-35) (emphasis added)

28

<u>c.  The Passby Observance</u>

BPA Leblanc testified that the vehicle he was in was in the number 1 lane southbound while the Pontiac Grand Am was in the number 1 lane northbound. [5]  The two lanes are separated by a distance of five feet.  (Leblanc p. 12).  BPA Leblanc testified that the driver sat up rigidly and stared straight ahead avoiding eye contact with him or his vehicle. It is unknown whether eye contact was made with the other trainees accompanying BPA Leblanc in the Border Patrol vehicle.  BPA Leblanc also conceded that if a person does or does not make eye contact raises his level of suspicion.  (Leblanc p. 34).  A driver's failure alone to look cannot weigh in the balance of whether there exists reasonable suspicion.  *Gonzalez-Rivera v. INS*, 22 F.3d 1441, 1446-1447 (9th Cir. 1994).

Otherwise seemingly innocuous behavior can justify a stop if combined with other circumstances that tend to arouse a reasonable suspicion that a particular person being stopped has committed or was about to commit a crime.  *Montero-Camargo*, 208 F.3d at 1129-1130.  In the instant case BPA Leblanc fails to support any reasonable suspicion of legal wrongdoing by failing to note that:  1) this commonly used Pontiac to transport illegal aliens and/or contraband had dark-tinted windows preventing him from looking into the vehicle;[6] 2) the Pontiac looked suspiciously low indicating a load of contraband and/or a group of illegal aliens in the large trunk space; or 3) the Pontiac appeared to have modified suspension that would keep the vehicle from riding low so as to not draw attention,  *See*

---

[5] As described by BPA Leblanc the number 1 lane is what is commonly referred to as the "fast lane".  (Leblanc p. 12)

[6] Q.  Between the Number 1 lane southbound and the Number 1 lane northbound, was there a divider, a median?
     A.  There's a two-lane highway - - or I'm sorry.  There's two stripes there seperated probably by five feet as the cars pass.
     Q. *Nothing blocking your view?*
     A. *No*.
     Q. *Were you able to see into the car?*
     A. *Yes.*
(Leblanc p. 12)(emphasis added)

1   *United States v. Diaz-Juarez*, 299 F.3d 1138, 1142 (9th Cir. 2002); 4) he made no effort to

2   glance into the back seat area to determine whether the backseat was removed, (Leblanc p.

3   12); or 5) to see if there was any number of individuals seated, or even laying low to avoid

4   detection.   This Court finds that the reason that BPA Leblanc did not or would not

5   acknowledge looking into the back seat is because he would have to concede: a) lack of

6   visual acuity to ascribe legal wrongdoing by the presence of illegal aliens and/or contraband;

7   or b) sufficient visual acuity to determine no legal wrongdoing.   Either one would

8   profoundly undermine his claimed subsequent observations discussed in the following Factor

9   "d".

10                    d. Observation While Following

11          Once BPA Leblanc's vehicle and the Pontiac passed each other, BPA Leblanc

12   instructed his driver to make a u-turn and follow the Pontiac. (Leblanc p. 14). At this time

13   the Pontiac was traveling at 40 miles per hour. (Id.) The Border Patrol vehicle BPA Leblanc

14   was in followed the Pontiac for five minutes one car length to, at most, two car lengths

15   behind. During this time the driver gripped the steering wheel [7] and constantly looked at his

16   side mirror and adjusted his rearview mirror. (Leblanc p. 15). On the other hand, Defendant

17   in the front passenger seat conversed with the driver and looked back two or three times

18   during the five minutes he was followed by the Border Patrol vehicle BPA Leblanc was in.

19   (Leblanc pp. 15-16). Presumably BPA Leblanc was unaware of an infant in a car seat in the

20   back seat of the Pontiac.  However, BPA Leblanc was emphatic that the two or three times

21   Defendant looked back  Defendant was looking directly at him and at no other Border Patrol

22   Agent or vehicle. (Leblanc p. 33).  Based on his experience BPA Leblanc considered the two

23   or three times Defendant looked back during a five minute "follow" was an "enormous

24   number of looks." (Leblanc p. 34).

25

26

27          [7] No description was provided as to hand placement or manner that characterizes

28   "gripping."

During the five minutes the Pontiac was followed no evasive action or unusual driving behavior was observed such as speeding up or slowing down; exiting the Nogales Highway; stopping; or swerving in the lane. *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000); *see Diaz-Juarez*, 299 F.3d at 1142-1143. Ultimately, the vehicle immediately yielded and pulled over without incident when the Border Patrol vehicle's emergency equipment was activated. (Leblanc p. 18).

A driver's preoccupation with a law enforcement vehicle following him is a natural reaction and is insufficient to justify an investigatory stop. *United States v. Jimenez*, 173 F.3d 752, 755 (9th Cir. 1999); *United States v. Garcia-Camacho*, 53 F.3d 244, 249 (9th Cir. 1995); *United States v. Robert L*., 874 F.2d 701, 703 (9th Cir. 1989).

Eye contact or lack thereof may be considered as a factor contributing to reasonable suspicion. However, whether eye contact is suspicious or not is highly subjective and can devolve into a case of "damned if you do, equally damned if you don't." *Montero-Camargo*, 208 F.3d at 1136; *see Gonzalez-Rivera,* 22 F.3d at 1446-1447; *Nicasio v. INS*, 797 F.2d 700, 704 (9th Cir. 1986); *United States v. Mallides*, 473 F.2d 859, 861 n.4 (9th Cir. 1973).

> ...it is a common, if not universal, practice for drivers and passengers alike to take note of a law enforcement vehicle coming up behind them. In fact, the most law-abiding of citizens frequently adjust their driving accordingly.

*Montero-Camargo*, 208 F.3d at 1136; *see Garcia-Camacho*, 53 F.3d at 247 (*citing Gonzalez-Rivera*, 22 F.3d at 1447) ("A driver's failure to look at the Border Patrol car [cannot be used to justify the agent's suspicion] since the opposite reaction, a driver's repeated glancing at a Border Patrol car, can also be used to justify the agent's suspicion. To give weight to this type of justification 'would put the officers in a classic 'heads I win, tails you lose' position [and] the driver, of course, can only lose.'").

The driver of the Pontiac's preoccupation with the Border Patrol vehicle following him is reasonable and understandable. The preoccupation was arguably generated by the Border Patrol vehicle driver's own excessive driving actions:

1
2
3

> The driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent and shall have due regard for the speed of the vehicles on, the traffic on and the condition of the highway.

4   Ariz. Rev. Stat. §28-730(A).  This Court finds that following a vehicle for five minutes, or

5   3.33 miles, by "one car length, two car lengths at the most" is neither reasonable nor prudent.

6   Common sense and experience holds that a vehicle following too closely would not have

7   enough time to stop without hitting the other vehicle or running off the roadway.  Law

8   enforcement observing a vehicle following another vehicle too closely can amount to

9   reasonable suspicion.  *See United States v. Chavez v. Valenzuela*, 268 F.3d 719, 723-724 (9th

10  Cir. 2001), *amended* 279 F.3d 1062 (2002), *overruled on other grounds as discussed in*

11  *United States v. Mendez,* 476 F.3d 1077, 1080 (9th Cir. 2007).

12
13

> Officers are encouraged to draw upon their own specialized training and experience in *assessing* the "totality of the circumstances."

14  *Colin*, 314 F.3d at 442  (emphasis added) *(citing Arvizu*, 534 U.S. at 272-275) "Certainly, an

15  agent cannot create a situation which amounts to a dangerous driving condition, observe the

16  drive react appropriately, and then base reasonable suspicion on the reaction because it

17  somewhat comports with 'suspicious behavior.'" *Sigmond-Ballesteros,* 285 F.3d at 1124.

18  Herein, the Border Patrol vehicle driver instead subjectively *created* the eye-contact factor

19  anteing to the totality of the circumstances. *See Id.*

20               e.  The License Plate and Lane Check

21        BPA Leblanc testified that he conducted a record check on the Pontiac's license plate

22  and it was a Nevada license plate. (Leblanc p. 16).  The Pontiac was stopped during a time

23  period that BPA Leblanc had conducted an unknown number of vehicle stops of Nevada

24  license-plated vehicles and had "gotten illegal aliens out of the vehicle." (Id.)  Moreover, a

25  1072 or lane check was conducted to determine whether the vehicle had entered through the

26  ports of entry from Mexico. (Leblanc p. 37).  It had not.  This raised his level of suspicion

27  because " vehicles that come down into this area, down to Tucson or southern Tucson in

28  Nogales or into Amado or Arivaca, generally make a trip into...Mexico[ ]" (Leblanc p. 17)

1   and "[b]ecause vehicles come from out of town into local Tucson area or southern Tucson

2   area and potentially pick up illegal aliens." (Id.)

3          Any weight that might be given to the aforementioned is nonexistent by BPA

4   Leblanc's own words:

5                  Q. Are you going to tell me that if you checked any vehicle in -
                   - in Nogales with out of state license plates, that if that vehicle
6                  has not recently crossed into Mexico, that automatically
                   becomes a suspect vehicle for smuggling either aliens or
7                  narcotics?
                   A. *That's not one of the justifiable facts or* [sic] whether - -
8                  Q. Is that what you're saying?
                   A. No.
9                  Q. All right. So there was nothing unusual about this - - about
                   the fact that this vehicle had not crossed into Mexico.
10                 A.  *Yes, but potentially unusual around this area.*

11  (Leblanc pp. 37-38). Conduct not necessarily indicative of criminal activity may, in certain

12  circumstances, be relevant to the reasonable suspicion calculus. *See Wardlow*, 528 U.S. 119.

13
                   At the same time, however, innocuous conduct does *not* justify
14                 an investigatory stop unless there is other information or
                   surrounding circumstances of which the police are aware, which
15                 when considered along with the otherwise innocuous conduct,
                   tend to indicate criminal activity has occurred or is about to take
16                 place.

17  *Montero-Camargo*, 208 F.3d at 1130. The officer must be able to articulate more than a

18  mere "inchoate and unparticularized suspicion or 'hunch'" of criminal activity. *Terry,* 392

19  U.S. at 27.

20                          f.  Proximity to the Border

21         Proximity to the border may be considered as a factor in the reasonable suspicion

22  calculus. *Diaz-Juarez*, 299 F.3d at 1142. The instant case occurred on the Nogales Highway

23  between Tucson and Nogales, Arizona, i.e. within 60 miles from the Unites States-Mexico

24  Border.

25  III. CONCLUSION

26         The requirement of particularized suspicion encompasses two elements. First, the

27  assessment must be based upon the totality of the circumstances. *Cortez*, 449 U.S. at 418.

28  The "totality of the circumstances" precludes a "divide and conquer" analysis, i.e., evaluation

and rejection of factors in isolation from each other. *Arvizu*, 534 U.S. at 274. Second, the assessment must arouse a reasonable suspicion that the particular person being stopped has committed or is about to commit a crime. *Cortez, supra* at 418. Reasonable suspicion cannot be based on broad profiles which cast suspicion on entire categories of people without any individualized suspicion of the particular person to be stopped. *United States v. Rodriguez-Sanchez*, 23 F.3d 1488, 1492 (9th Cir. 1994), *overruled in part on other grounds, Montero-Camargo,* 208 F.3d at 1131-1132; *Sigmond-Ballesteros,* 285 F.3d at 1121.

The Government herein argues that an investigatory stop was supported by reasonable suspicion. The Government tendered a rote recitation of factors by BPA Leblanc of innocent driving behavior asking the court to embrace it as criminal behavior to a trained and experienced eye.

In sum, the totality of the circumstances are that BPA Leblanc spotted a red Pontiac Grand Am on the Nogales Highway at 5:45 p.m., which was rush hour when smugglers attempt to blend in with traffic. (Leblanc p. 27). There is a tremendous amount of traffic on Interstate 19 at this time. (Leblanc p. 28). The location is a probative factor for the obvious reason: transporting illegal aliens and/or drugs at the most immediate point of their introduction into the United States. The time of day is marginally probative to the instant reasonable suspicion analysis because both smugglers and law-abiding individuals will use Nogales Highway as an alternate route to driving on Interstate 19 at rush hour. (Id.) Consequently, driving in rush hour on either heavily-traveled Interstate 19 or the sparsely-traveled Nogales Highway during rush hour would always be suspect.

BPA Leblanc testified that the Pontiac Grand Am is a vehicle commonly used to transport illegal aliens because of access from the back seat to large trunk space. Yet he does not mention this in his report because it was not relevant. (Leblanc p. 35). He states that it was important to testify regarding the use of this type of vehicle only *after* reading the Government's Response to Defendant's Motion to Suppress.   Nonetheless, BPA Leblanc fails to provide a rational explanation as to why this particular Pontiac Grand Am was suspect. *See Rojas-Millan,* 234 F.3d at 469 (citation omitted) (The inferences that officers

1   draw based upon their experience "must also be grounded in objective facts and be capable

2   of rational explanation.") BPA Leblanc did not note tinted windows; did not note the

3   presence of persons in the back; did not note whether the back seat appeared to have been

4   removed; did not note if the vehicle was riding low; did not note if the vehicle had modified

5   suspension.  Any one of these conditions would have otherwise aroused individualized

6   suspicion upon the driver of the Pontiac.  Many innocent individuals purchase vehicles with

7   large trunk space including space behind the back seat in which a person or luggage might

8   fit.  *Rodriguez*, 976 F.2d at 596, *amended* 997 F.3d 1306; (Leblanc p. 31).  Thus, this Court

9   is constrained to conclude that nothing about the fact of driving a Pontiac Grand Am at rush

10  hour on the Nogales Highway suggests that the Pontiac was then about to be used or being

11  used to commit a crime.

12         When BPA Leblanc passed the Pontiac going in the opposite direction, the Pontiac's

13  driver did not make eye contact with him. However, after BPA Leblanc's vehicle began

14  following the Pontiac, the Pontiac's driver adjusted the rearview mirror and looked out his

15  side mirror.   The Pontiac driver adjusting the rearview mirror and preoccupation with the

16  Border Patrol vehicle following unreasonably and improvidently close, by looking at the side

17  and rear view mirror is a normal reaction.  Further, the front seat passenger Defendant

18  glancing two or three times over a five minute period is not extraordinary in number and in

19  BPA Leblanc's opinion unreasonably and subjectively narrows the occasion to glance back

20  to "none or one."  Both the Pontiac driver and Defendant making eye contact, in light of the

21  unsafe manner the Border Patrol vehicle was following, was not unreasonable.   *See*

22  *Sigmond-Ballesteros,* 285 F.3d at 1124, 1127 (excluding from the reasonable suspicion

23  analysis the defendant's "appropriate reactions" to the agent's unsafe driving behavior).

24  Moreover, the claimed eye contact between Defendant and only BPA Leblanc and no other

25  agent does not ring true. This testimony undercuts BPA Leblanc's earlier testimony that he

26  found suspicious the Pontiac's driver failure to make eye contact when he passed by the

27  Pontiac. As stated before, making eye contact or failing to do so, without more, is not

28  probative to this reasonable suspicion calculus.  Additionally, the Pontiac did not speed up

1   or slow down.  It was not driven erratically.  Nothing in the way it was being driven hints at

2   evasive behavior.

3         As to the license plate and lane check query, BPA Leblanc concedes it is not a

4   justifiable fact but rather potentially unusual.  However, other than his testimony that he has

5   stopped other vehicles from Nevada with illegal aliens therein, BPA Leblanc fails to

6   particularize suspicion to the driver of the Pontiac and instead composes a broad profile to

7   include individuals who happen to be driving on Nogales Highway, in the proximity of the

8   Mexican border, at rush hour who failed to look at him when he first passed but did make eye

9   contact and glance his way when he was following them and who were not interested in

10  going into Mexico; individuals who enter Mexico on foot but leave their vehicles on the

11  United States side for anyone of a number of innocent and legitimate reasons; or individuals

12  who are simply in the area for and under lawful purposes and circumstances.

13        The reasonable suspicion analysis requires consideration of "the combination of

14  factors motivating an investigatory stop to determine whether they support a finding of

15  reasonable suspicion under the totality of the circumstances."  *Diaz-Juarez,* 299 F.3d at 1141

16  (*citing Arvizu,* 534 U.S. 266).  Under such analysis, "[i]ndividual factors that may appear

17  innocent in isolation may constitute suspicious behavior when aggregated together."  *Id*.  For

18  the reasons stated above, the otherwise innocuous factors of type of vehicle, passby

19  observance of vehicle and occupants, observation of vehicle and occupants while following

20  at an unsafe distance, license plate and lane check query cited by BPA Leblanc when

21  considered in the aggregate with the factors of proximity to the border and that it was rush

22  hour do not  "suffice[] to form a *particularized and objective basis", Arvizu*, 534 U.S. at 277,

23  that the driver of the Pontiac and/or Defendant were about to commit or had committed a

24  crime.  Consequently, the Magistrate Judge finds that under the totality of the circumstances,

25  the facts available to the Border Patrol taken together before the investigatory stop did not

26  establish a reasonable basis for such stop.

27

28

1   IV. RECOMMENDATION

2        For the foregoing reasons, the Magistrate Judge recommends that the District Court

3   grant Defendant's Motion to Suppress Evidence (Doc. No. 13) of a Glock 9 mm pistol,

4   Model 17, bearing serial number HRK 332 in Count 1 of the Superceding Indictment.

5        Pursuant to 28 U.S.C. §636(b) and Rule 59 of the Federal Rules of Criminal

6   Procedure, any party may serve and file written objections within ten days after being served

7   with a copy of this Report and Recommendation.. If objections are filed, the parties should

8   use the following case number: CR 07-1439-TUC-FRZ.

9        Failure to file objections in accordance with Fed.R.Crim.P. 59 will result in waiver

10  of the right to review.

11       DATED this 18th day of January, 2008.

12

13

14   _____
                    Héctor C. Estrada
15             United States Magistrate Judge

16

17

18

19

20

21

22

23

24

25

26

27

28